**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| ROCKWELL ACQUISITIONS, INC., an Oklahoma corporation, | ) ) ) |
| Plaintiff, | ) ) |
| -vs- | ) )   Case No. CIV-08-146-F ) |
| ROSS DRESS FOR LESS, INC., a Virginia corporation, | ) ) ) |
| Defendant. | ) ) |

**ORDER**

Before the court are the cross motions of the parties for summary judgment pursuant to Rule 56, Fed. R. Civ. P. Upon due consideration of the parties' submissions, the court makes its determination.

Background

Plaintiff, Rockwell Acquisitions, Inc., commenced this action in the District Court of Oklahoma County, State of Oklahoma, on January 22, 2008. Defendant, Ross Dress for Less, Inc., timely removed the action to this court on February 8, 2008, on the basis of diversity jurisdiction. In its petition, plaintiff seeks damages against defendant for breach of a commercial lease between the parties and for tortious interference with a real estate contract between plaintiff and a third-party. Plaintiff also seeks declaratory relief requesting the court to determine the parties' rights under the commercial lease. Defendant moves for summary judgment as to plaintiff's claims against it. Plaintiff requests summary judgment in its favor as to its claims against defendant except for the tortious interference with contract claim.

Standard of Review

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  When applying this standard, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. (quotation omitted).  When the parties file cross motions for summary judgment, as in this case, the court is entitled to "assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." Id. (quotation omitted); *see also*, Buell Cabinet Co., Inc. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.")

Relevant Facts

The following relevant facts are undisputed.  Plaintiff owns Rockwell Plaza, a shopping center located at the southwest corner of Northwest Highway and Rockwell Avenue in Oklahoma City, Oklahoma.  On or about January 31, 2005, plaintiff and defendant entered into a commercial lease, wherein plaintiff agreed to lease to defendant and defendant agreed to lease from plaintiff approximately 30,000 square feet of retail space in the shopping center.

Defendant began occupancy under the lease with a "delivery date" of February 13, 2006, and a "commencement date" of June 13, 2006. The lease is to expire on January 31, 2017. Rent under the lease is $22,593.75 monthly and $271,125.00 annually ("Minimum Rent"), exclusive of applicable Common Area Maintenance charges and other required reimbursements by defendant.

The lease contains the following pertinent provisions:

6.1.3 Required Co-Tenancy.

>   (a)   Co-Tenancy Requirements. A "Reduced Occupancy Period" shall occur unless all of the following requirements are satisfied on the Commencement Date and thereafter throughout the Term: (i) the Required Co-Tenants specified in Section 1.7.1, shall be open in the Shopping Center every day for retail business during the customary business hours for each such Required Co-Tenant; (ii) the Required Co-Tenants are operating in at least the Required Leasable Floor Area for each Required Co-Tenant specified in Section 1.7.1 under bona fide leases of a minimum of three (3) years' duration; and (iii) retail tenants of the Shopping Center, including the Required Co-Tenants, are open and operating under bona fide leases in at least the percentage of the Leasable Floor Area of the Shopping Center indicated in Section 1.7.2 (the [defendant] Store shall be excluded from the numerator and denominator of the fraction used to calculate such percentage). Landlord shall promptly notify Tenant of any Reduced Occupancy Period.

>                           * * * *

>   (c)   Secondary Reduced Occupancy Period. If a Reduced Occupancy Period occurs at any time after the Commencement Date and is not the result of an Exempted Discontinuance as hereinafter defined ("Second Reduced Occupancy Period"), Tenant's total obligation for Rent

3

shall be replaced by Substitute Rent which shall be payable within fifteen (15) days after the close of each calendar month during the Secondary Reduced Occupancy Period and continuing until the expiration of the Secondary Reduced Occupancy Period (or earlier if Tenant terminates this Lease as hereinafter provided in this Section 6.1.3(c)). If the Secondary Reduced Occupancy Period continues for a period of twelve (12) consecutive calendar months (except in the event of an Exempted Discontinuance), and provided that Tenant was open in the Store for business at the onset of the Secondary Reduced Occupancy Period, Tenant shall have the ongoing option to continue to pay Substitute Rent or to terminate this Lease upon giving Landlord Tenant's Reduced Occupancy Termination Notice, provided the Reduced Occupancy Termination Notice is given prior to the expiration of the Secondary Reduced Occupancy Period . . . .

**2.    DEFINITIONS OF GENERAL APPLICATION**

\* \* \* \*

Substitute Rent.  Substitute Rent shall mean the lesser of (a) Minimum Rent, or (b) two percent (2%) of Tenant's Gross Sales during the preceding month.  Substitute Rent, where applicable in this Lease, shall be paid in lieu of Minimum Rent and Reimbursements.

**1.7    Required Co-Tenancy.**

**1.7.1.**    At least all of the following three (3) Co-Tenants [or other comparable replacement Anchor Tenant (as defined below) replacing one (1) or more of the named Co-Tenants ("Required Co-Tenants") occupying no less than ninety percent (90%) of the Required Leasable Floor Area of the Required Co-Tenant being replaced] occupying

4

no less than Ninety-percent (90%) of the Required Leasable Floor Area indicated as follows:

| Co-Tenants Name | Required Leasable Floor Area (minimum sq. ft.) |
|---|---|
| (a) Target | 113,000 |
| (b) Big Lots | 27,000 |
| (c) PetsMart | 20,000 |

An "Anchor Tenant" is a national retailer with at least one hundred (100) stores or a regional retailer with at least seventy-five (75) stores.

In the fall of 1995, Big Lots, a "Required Co-Tenant," as defined in the lease, informed plaintiff of its desire to terminate its lease with plaintiff, due, in part, to overall company restructuring. The "Required Leasable Floor Area" for Big Lots was 27,000 square feet. Ninety percent of the 27,000 square feet leased by Big Lots is 24,300 square feet.

Prior to Big Lots ceasing its operations, plaintiff negotiated with two new tenants to replace the "Required Leasable Floor Area" occupied by Big Lots. On or about March 27, 2006, plaintiff entered into a lease with Brown Group Retail Inc., d/b/a Famous Footwear. Famous Footwear is a national retailer with at least 75 stores. On or about April 6, 2006, plaintiff entered into a lease with K&G Men's Company, Inc., a subsidiary of Men's Warehouse. Men's Warehouse is a regional retailer with at least 75 stores. Both Famous Footwear and Men's Warehouse moved into the shopping center prior to Big Lots closing. Although the leasable floor area occupied by each of the stores does not equal or exceed ninety percent of the "Required

5

Leasable Floor Area" occupied by Big Lots or 24,300 square feet, the stores combined leasable floor area does equal or exceed 24,300 square feet.

In the fall of 2006, a dispute arose between plaintiff and defendant regarding defendant's failure to pay its share of the Common Area Maintenance ("CAM") charges due under the lease. As a result of defendant's failure to pay its share of the CAM charges, plaintiff declared a default under the lease. On November 7, 2006, defendant issued plaintiff a check covering the remaining balance of the disputed CAM charges due. However, defendant did not pay plaintiff the accrued interest on the withheld funds while they were being withheld, in addition to other fees and costs.

On January 31, 2007, Big Lots closed its store at plaintiff's shopping center. On or about June 8, 2007, plaintiff leased a portion of the space formally occupied by Big Lots to Harold's, Inc. Plaintiff altered the space, including reducing its size, to accommodate Harold's Inc. The business does not qualify as an "Anchor Tenant" as defined under the lease.

As a result of the alteration of the space formerly occupied by Big Lots, the shopping center does not have vacant space large enough to accommodate a single tenant occupying ninety-percent of the 27,000 square feet previously occupied by Big Lots.

In November of 2007, plaintiff entered into a contract for the sale of the shopping center with a national retail mall owner-operator, Gemini Acquisition Company, LLC. The lease between plaintiff and defendant contemplated the possibility of such a sale of the shopping center, and under the lease, defendant was required to provide plaintiff with an estoppel certificate setting forth any pertinent information relating to the status of the lease.

In December of 2007, plaintiff advised defendant that a co-tenancy violation occurred with the closing of Big Lots.

On January 8, 2008, defendant provided plaintiff with an estoppel certificate asserting that, pursuant to sections 6.1.3(a) and (c) of the lease, defendant is entitled to and has been entitled to pay "Substitute Rent" since Big Lots ceased doing business in the shopping center.

On January 14, 2008, defendant advised plaintiff that due to the co-tenancy violation, defendant is paying "Substitute Rent" from February 2007 to December 2007 and that there was a net overpayment of rent to plaintiff in the amount of $253,295.40.  Defendant asserted a right to an offset of $253,295.40 for 2008 rent.[1]

Gemini Acquisition Company, LLC, refused to complete the acquisition of the shopping center.

Discussion

Breach of Contract Claim

In its petition, plaintiff alleges that defendant "has breached the Lease by failing to pay January 2008 rent in the amount required under the Lease."  *See*, Petition at ¶ 32, exhibit 1 of doc. no. 1.[2]  Defendant, in its papers, contends that under the lease, specifically sections 6.1.3(a) and (c) and 1.7.1, it is entitled to pay "Substitute Rent," as defined in the lease, because Big Lots, one of the "Required Co-Tenants," departed from the shopping center and was not replaced by an "other comparable replacement

---

[1] In its motion, defendant states that there was an error in the calculation of the CAM charges and that defendant has the right of offset in the amount of $253,011.98 rather than $253,295.40 for 2008 rent.

[2] In the joint status report filed by the parties on April 8, 2008, plaintiff stated that defendant had breached the lease by failing to pay rent for January, February and March of 2008.  *See*, Joint Status Report, doc. no. 14, ¶ 4 at p. 3.

7

Anchor Tenant" who occupied no less than ninety percent of the "Required Leasable Floor Area" of Big Lots or 24,300 square feet. Because Big Lots was not replaced by an "other comparable replacement Anchor Tenant," defendant contends that a "Secondary Reduced Occupancy Period" existed and is continuing, thereby justifying the payment of "Substitute Rent." Plaintiff, however, argues that no Reduced Occupancy Period occurred and no Secondary Reduced Occupancy Period existed because the lease permits plaintiff to replace Big Lots with one or more tenants as long as the replacement tenants fall within the definition of "Anchor Tenant" and the tenants occupy at least ninety percent of the Required Leasable Floor Area previously occupied by Big Lots. According to plaintiff, Big Lots was replaced by Famous Footwear and Men's Warehouse, both of which qualify as an "Anchor Tenant," and the combined square footage occupied by these stores is at least ninety percent of the Required Leasable Floor Area formerly occupied by Big Lots. Plaintiff therefore contends that defendant is not entitled to pay "Substitute Rent" and has breached the lease by failure to pay the required rent.

The section of the lease primarily at issue and requiring interpretation by the court is section 1.7.1. That section, previously set out in this order, provides:

> At least all of the following three (3) Co-Tenants [or other comparable replacement Anchor Tenant (as defined below) replacing one (1) or more of the named Co-Tenants ("Required Co-Tenants") occupying no less than ninety percent (90%) of the Required Leasable Floor Area of the Required Co-Tenant being replaced] occupying no less than Ninety-percent (90%) of the Required Leasable Floor Area indicated as follows:

| Co-Tenants Name | Required Leasable Floor Area (minimum sq. ft.) |
|---|---|
| (a) Target | 113,000 |
| (b) Big Lots | 27,000 |
| (c) PetsMart | 20,000 |

An "Anchor Tenant" is a national retailer with at least one hundred (100) stores or a regional retailer with at least seventy-five (75) stores.

Defendant contends that the language of section 1.7.1 is plain and unambiguous and provides for the replacement of a "Required Co-Tenant" by an "other comparable replacement Anchor Tenant" which must occupy "no less than ninety percent (90%) of the Required Leasable Floor Area" of the Required Co-Tenant.  Defendant maintains that section 1.7.1 talks about the "other comparable replacement Anchor Tenant" in the singular.  Defendant contends that the language of section 1.7.1 does not allow multiple tenants aggregating their space to satisfy the co-tenancy requirements of section 1.7.1.

Plaintiff also asserts that the language of section 1.7.1 is clear and unambiguous.  However, according to plaintiff, section 1.7.1 does not prohibit plaintiff from replacing a Required Co-Tenant with more than one "Anchor Tenant." Plaintiff asserts that the lease does not limit the number of anchor tenants.  Plaintiff points out that section 1.7.1 begins with the phrase "at least all" and plaintiff contends that such phrase suggests that more than the original three Required Co-Tenants might occupy the shopping center at some point.  Plaintiff also argues that section 1.7.1 provides for one anchor tenant replacing one or more Required Co-Tenants and

consequently the lease contemplates less than three Required Co-Tenants. Plaintiff asserts that the "other comparable replacement Anchor Tenant" clause should be read in the plural, as the lease, in section 26.7, provides that singular and plural words shall be deemed to include the other. According to plaintiff, section 1.7.1 merely requires that the anchor tenants occupy at least ninety-percent of 160,000 square feet (the aggregate amount of total Required Leasable Floor Area occupied by the three original Required Co-Tenants). Plaintiff contends that it has met the express requirements of section 1.7.1 because the replacement tenants (Famous Footwear and K&G) both qualify under the lease as an "Anchor Tenant," these stores occupy in the aggregate at least ninety percent of the Required Leasable Floor Area of Big Lots, the replaced Required Co-Tenant, and the anchor tenants currently in the shopping center occupy at least ninety-percent of 160,000 square feet.

The court, upon review of section 1.7.1, agrees with the parties that the provision is unambiguous. The court, however, concurs with defendant that section 1.7.1 does not permit plaintiff to replace a Required Co-Tenant, such as Big Lots, with two replacement anchor tenants and aggregate their square footage to satisfy the 24,300 square feet minimum. The bracketed portion of section 1.7.1 explains the replacement of a Required Co-Tenant. It states "[or other comparable replacement Anchor Tenant replacing one (1) or more of the named Co-Tenants ('Required Co-Tenants') occupying no less than ninety percent (90%) of the Required Leasable Floor Area of the Required Co-Tenant being replaced]." The court concludes that this phrase does not contemplate replacing one or more Required Co-Tenants with more than one "other comparable replacement Anchor Tenant." The language used "other comparable replacement Anchor Tenant" is singular. Although the lease provides that in section 26.7. that "singular and plural words shall be deemed to include the other,

10

as the context may require" plaintiff's interpretation of the lease requires more than replacing a singular word with a plural word, it requires changing a whole phrase "other comparable replacement Anchor Tenant," to "one or more comparable replacement Anchor Tenants." The court concludes that section 1.7.1 only provides for one replacement anchor tenant which occupies at least ninety percent of the Required Leasable Floor Space of the Required Co-Tenant being replaced. The court rejects plaintiff's "at least all" and "one (1) or more of the named Co-Tenants" arguments. The court concludes that these phrases do not permit plaintiff to replace a Required Co-Tenant with one or more replacement anchor tenants whose aggregate space constitutes at least 90% of the Required Co-Tenant's required space. The court also finds that plaintiff's "90% of 160,000 square feet" argument is not supported by the contract language.

     In its papers, plaintiff also argues that defendant should be estopped from arguing that plaintiff violated the co-tenancy requirements of section 1.7.1 by not replacing Big Lots with one Anchor Tenant occupying no less than ninety percent of the Required Leasable Floor Area previously occupied by Big Lots. According to plaintiff, defendant waited almost one year after Big Lots vacated the shopping center to raise the co-tenancy issue. Plaintiff contends that due to defendant's silence, the space formerly occupied by Big Lots has been significantly altered. Since the space has been altered, plaintiff asserts that it cannot cure the co-tenancy issue because the shopping center does not have any available space as large as the space formerly occupied by Big Lots to lease to another Anchor Tenant. Plaintiff contends that it relied upon defendant's silence, in altering the space for Harold's Inc. Plaintiff argues that it would suffer a substantial detriment if defendant were allowed, after almost a year of silence, to claim that plaintiff violated the co-tenancy requirements.

The court rejects plaintiff's estoppel argument. Under Oklahoma law, estoppel does not result from silence unless a party was under an imperative duty to speak and the other party was mislead by the silence. Oilton State Bank v. Butler, 268 P. 261, 264 (Okla. 1928); *see also*, Sautbine v. Keeler, 423 P.2d 447, 452 (Okla. 1966) ("To constitute estoppel by silence requires not only opportunity to speak, but also an obligation to speak.") Here, plaintiff has not shown that defendant was under an obligation to speak and advise plaintiff that there was a co-tenancy requirement violation when Big Lots closed its doors. Moreover, the lease, specifically, section 6.1.3., requires plaintiff to notify defendant of any "Reduced Occupancy Period." Even though Big Lots closed at the end of January 2007, plaintiff did not notify defendant of the co-tenancy violation until December of 2007. Approximately, one month later, defendant advised that it was paying "Substitute Rent." Without any showing that defendant was under a duty to speak prior to January of 2008, when it did speak, the court concludes that plaintiff's estoppel argument fails as a matter of law.

Because plaintiff did not replace Big Lots with an "other comparable replacement Anchor Tenant" occupying at least 90% of Big Lot's space, namely 24,300 square feet, the court concludes that under section 6.1.3.(a) of the lease, a Reduced Occupancy Period occurred when Big Lots closed its store and that because the Reduced Occupancy Period arose after defendant's occupancy of the shopping center, a Secondary Reduced Occupancy Period existed and defendant was entitled to pay "Substitute Rent" under section 6.1.3.(c) of the lease. The court therefore concludes that defendant was entitled to pay "Substitute Rent" from February 1, 2007 forward.

Although the court finds that defendant is entitled to pay "Substitute Rent" from February 1, 2007, the court cannot conclude as a matter of law that the dollar amount defendant contends it is entitled to offset for 2008 rent is correct. Therefore, the court cannot grant summary judgment to defendant as to the entirety of plaintiff's breach of contract claim for failure to pay rent. In its reply brief, defendant states that it has provided the backup documentation to plaintiff that will allow plaintiff to audit defendant's calculation of the offset. Defendant suggests that the court defer ruling on the accuracy of the offset calculation until after plaintiff has reviewed the documentation and decides whether the calculation is correct. As it appears that plaintiff has had the backup documentation for over thirty days, the court directs plaintiff, within ten days from the date of the order, to either stipulate in writing to the offset calculation for 2008 rent ($253, 011.98) proffered by defendant (without prejudicing plaintiff's right to appeal the issue of whether defendant is entitled to pay "Substitute Rent") or advise the court in writing that the amount of the offset calculation is an issue for trial.

Plaintiff, in its petition, alleges that it has suffered consequential damages due to defendant's failure to act in good faith in regard to providing an estoppel certificate. Because the court concludes that defendant was entitled to pay "Substitute Rent" under the lease, the court concludes that defendant is entitled to summary judgment on this portion of plaintiff's breach of contract claim. Defendant did not breach the lease by providing an estoppel certificate which stated that defendant was entitled to pay "Substitute Rent." The court therefore concludes that plaintiff is not entitled to consequential damages for breach of the lease as requested in the petition.

In its petition, plaintiff also alleges defendant "has breached the lease by failing to pay [plaintiff] the late charges, fees and interest assessed on [defendant's] monthly

13

CAM charges that were untimely paid." *See*, Petition at ¶ 31, exhibit 1 of doc. no. 1. Although defendant in its motion seeks summary judgment on plaintiff's claims, defendant does not specifically move for summary judgment on this aspect of plaintiff's breach of contract claim. Indeed, defendant states in its reply that defendant "does not seek to resolve [the] relatively minor 'costs, interest and attorney fees' issue on summary judgment." *See*, defendant's reply, p. 3 (doc. no. 29). Plaintiff has also not specifically addressed this claim in its cross-motion for summary judgment. The court therefore concludes that plaintiff's breach of contract claim based upon defendant's failure to pay plaintiff late charges, fees and interest assessed on defendant's monthly CAM charges remains at issue for trial. The court nonetheless directs the parties to confer in good faith and for plaintiff to advise the court within ten days from the date of this order whether the parties can agree to a resolution of this claim or whether this claim must proceed to trial.

Declaratory Relief

In its petition, plaintiff seeks the issuance of a declaratory judgment determining that a Required Co-Tenant may be replaced by one or more tenants as long as the replacement tenants qualify as an Anchor Tenant under the lease and occupy at least ninety percent (90%) of the Required Leasable Floor Area previously occupied by the Required Co-Tenant being replaced. In light of the court's finding that the lease requires that a Required Co-Tenant must be replaced by one Anchor Tenant which occupies no less than ninety-percent (90%) of the Required Leasable Floor Area previously occupied by the Required Co-Tenant, the court finds that defendant is entitled to summary judgment as to plaintiff's request for declaratory relief.

Tort Claim

In its petition, plaintiff alleges a tortious interference with contract claim against defendant on the basis of defendant issuing an estoppel certificate stating that there had been a co-tenancy violation and that defendant was entitled to pay "Substitute Rent." In order to recover on its tortious interference with contract claim, plaintiff must establish that the alleged "interference was malicious and wrongful, and that such interference was neither justified, privileged, nor excusable." Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1236 (10th Cir. 2006). The court finds that defendant is entitled to summary judgment on this claim. As defendant is entitled to pay "Substitute Rent" and its statements in the estoppel certificate were correct, the court concludes that defendant's actions were not wrongful and its actions were justified.

Conclusion

Based upon the foregoing, the court **GRANTS in part** and **DENIES in part** Defendant Ross Dress for Less, Inc.'s Motion for Summary Judgment, filed September 4, 2008 (doc. no. 18). Defendant's motion is **GRANTED** as to plaintiff's request for declaratory judgment, plaintiff's breach of contract claim based upon a failure to act in good faith in providing an estoppel certificate and plaintiff's tortious interference with contract claim. Defendant's motion is **GRANTED** as to plaintiff's breach of contract claim based upon a failure to pay January 2008 (and other 2008) rent in the amount required under the lease to the extent the court finds that defendant is entitled to pay "Substitute Rent" but Defendant's motion is **DENIED** as to the offset calculation proffered by defendant for 2008 rent. Plaintiff is **DIRECTED**, within ten days from the date of the order, to either stipulate in writing to the offset calculation for 2008 rent ($253, 011.98) proffered by defendant or advise the court in writing that the amount of the offset calculation for the 2008 rent is an issue for trial.

15

Plaintiff is also **DIRECTED** to advise the court, within ten days from the date of this order, whether the parties agree to a resolution of the breach of contract claim for failing to pay late charges, fees and interest assessed on defendant's monthly CAM charges that were untimely paid or whether this claim must proceed to trial. Plaintiff's Cross-Motion for Summary Judgment, filed October 15, 2008 (doc. no. 28) is **DENIED**.

DATED  December 22, 2008.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

08-146p008(pub).wpd